Good morning everyone. The panel has before it a total of four cases. One of them is being submitted to that argument later today on the briefs. That is Appeal 1374 from 2008, McZeel v. Sprint, Next Health. And the argument list of three appeals will appear at argument first in Urbe Appeal 1358 from 2008, Urbe v. ITC. Mr. Hampton, good morning to you. Welcome to the court. Good morning, Your Honor. Please proceed. Good morning. May it please the court, I am Phil Hampton, and I am counsel for the appellants, Urbe Electromedizin v. MBH and Urbe USA incorporated. Today, Urbe appeals from the construction of two claim terms from the ITC. Those claim terms are working channel and siloed. I thought there was agreement by the two sides with the definition of siloed. How can you appeal from something if you agree to it in front of the trial form? Well, Your Honor, we agreed with siloed, but then the ITC, ALJ, actually went back and said siloed had to mean parallel. And that was never in any of the parties' briefs, that siloed, if you construed it to mean alongside, that alongside then meant parallel. So, in effect, we believe that the construction by the ALJ was that siloed meant parallel. So, in other words, you're saying he totally changed his construction between an earlier stage and a later stage, in your view? Yes, in our view, that's what happened. And the one you agreed to up front was correct, and when you changed one from later, you say it's incorrect. Yes, Your Honor. As a matter of fact, it was Irby in the post-hearing brief of the ITC that proposed siloed being interpreted as alongside. Is this an error in the infringement analysis or in the claim construction? I think it's an error in the claim construction because if he construes it as… I never know the difference. If you know the difference, you're smarter than I am. Tell me, how can you get around the two working channels, though? You've got clearly a first and a second working channel. You've got a plurality mentioned in another point in the claims of channels. Isn't that fatal to your claim, even if we agree with you on sideways? No, Your Honor. I mean, the claim says it has the plurality of working channels. The claim also says that in one of the working channels, that optical means are placed within one of the working channels. The second working channel. It's very clear. The optical means position within a second working channel. Within a second working channel. So you've got to have a second one. Help me out here. How can you overcome that? Well, we overcome it by overcoming the improper definition of the improper construction of the working channel by the ALJ. What was the error specifically? The error is that the patent itself, the specification itself, discloses many different working channels. And some of the working channels… What was the definition of working channel was that you say is wrong? Well, the ITC construed working channel to mean a channel for which a device that performs work may be inserted. And we believe that a working channel, you don't need a device inserted through which work is performed. It doesn't have to do with the fixed optics. In the accused device, they're fixed optics. And they're not inserted in and out of the channel. And the decision is not entirely clear by the ALJ. But as I understand it, he's saying that a fixed optic installation is not a working channel. And it seems to me that that's supported by Figure 1 and the description of Figure 1 in the specification. Because if you look at Figure 1, there are three things labeled there, two working channels, 6 and 7. And the optics are labeled separately as 5. And that's not called a working channel in the specification in Common 4. So doesn't that suggest strongly that fixed optics are not a working channel? No, we don't believe so, Your Honor. Is what I described incorrect? We believe it is incorrect. What's incorrect about it? We believe it's incorrect because if you look at, again, Claim 1 says that optical means are in its second working channel. Put aside Claim 1 for a moment. Let's just talk about Figure 1 and the description of Figure 1 in Common 4. There's a – Figure 1 shows optics 5, right? And that's not described as a working channel. But optics 5 is the optical means. We believe optics 5 is the optical means. Right. So therefore – So you can have optical means that aren't in a working channel, right? We don't believe so. How is that consistent with Figure 1 in Common 4? Again, we believe that you have to read – you cannot read out any portion of that. No, I understand. But address what I'm talking about. The labeling – it seems to me that the labeling of Figure 1 is really fatal to your theory because it's showing 5, optics, as not being a working channel. Fixed optics as not being a working channel. Isn't that correct? Am I wrong in reading the specification? You are not incorrect in that the words fixed optics is not equated to a working channel in the description of Figure 1. Is that the problem? We don't think so because, again, in the specification, in the claims, there is talk of optical means being disposed within a second working channel. So we believe that fixed optics of Figure 1, which is an optical means, is therefore part of or therefore is within a working channel. Well, claim 1 could be referring to insertable optics, couldn't it? But again, if you look at the entire patent as a whole, the only type of optics which gives breadth to the entire claim is if the optics are fixed because later in the patent we talk about a field of view, a fixed field of view. And if you had insertable optical means, you would be able to change the field of view by just moving the insertable optical means in and out. However, it was taught in patent that you want to pick an endoscope that has a wide view because if not, you would have to either move the entire endoscope or change endoscopes. And we believe the only way that that works is if the optics are built-in and fixed. But in theory, you could have movable optics, right? In theory, you could have movable optics, but our position is that working channel must be construed broadly enough to include built-in optical means. So what is your point then? That Figure 1 refers to some different embodiment than Claim 1? No, Your Honor. Again, we believe that in Figure 1, you have a plurality of working channels. You have two parallel working channels, neither of which is the optic, right? We disagree with that. Why would you agree if that's what Figure 1 shows? Again, Figure 1, there's fixed optics in Figure 1. That is the optical means. The patent says that optical means are exposed in a second working channel. So it is our position that even though it is not called out as a working channel, that those optics in Figure 1 are within a second working channel. Show me that in the spec. Show me in the spec where you support your view. Discussion about the figures at the top. Actually, yes, Your Honor. We agree that it's not discussed in the reference to the figures. We agree that that's the case. Is it discussed anywhere? Yes, it is discussed. Yes, Your Honor. It's discussed where there's talk about optical means exposed within an instrument channel. And I will get you this side of the room, too. Do you want to say a word to your counsel, Your Honor? Yes, Your Honor. Thank you. Let me look. Good morning. Thank you. Please, the Court. Jonathan Abler for the International Trade Commission. As we've discussed a bit today, this contributory infringement case, if I may just for a moment digress from title structure issues, is about a very limited number of endoscopic probes manufactured by Herbie's competitor, Kalos Martin, and sold to the hospitals in the United States by Kennedy. We know the facts. We read the briefs. It seems like you should be responding to what he just said. Well, the point that I'd like to add is that no matter how the Court construes working channel or side probes, that there is no substantial evidence at all that the Herbie 1.5, that the Kennedy 1.5 millimeter probes were ever used. Or that Herbie solved the problem with respect to the 2.3 millimeter.  Because that's the basis for the non-infringement. That is true. But with respect to the working channel, there's no evidence that the Kennedy, as you pointed out, that a probe, the plurality of working channels was ever used. But there's also, but beyond before getting to the working channel issue, there's no testimony or substantial evidence to support the idea that the 2.3 probes were used in a manner that even of the Herbie's plane construction is infringing. In other words, the only testimony in the record as to how the 2.3 millimeter probes were used. This is a sidewardly point? This is a sidewardly point. But I don't believe that ALJ is having rest with the non-infringement finding with respect to the 2.3 millimeter on the sidewardly issue. Am I wrong? You're not wrong. That is correct. But my point is simply that the record has, there's no substantial evidence to support the argument that it was used in an infringing manner. And the burden was on Herbie in the first place to make that point. But the administrative law judge missed the main point in the case then? Well, no, the administrative law judge didn't. I thought you were defending his judgment, not questioning it. He didn't miss the main point because he stopped it by the working channel construction, which is why, of course, that's such a significant issue. But my point is that even on the substantial evidence side, that Herbie can't point to any special evidence to support its fundamental infringement point. But back to the, obviously, the ALJ's plane construction, the commission clearly abused the language of the specification. And the ALJ's construction is being fully consistent with the notion of having two working channels and just explicitly set forth the specification and in claim 1 and 35, having a plurality of working channels. But beyond that, that the ALJ's construction is broad enough to include built-in optics in addition to the two working channels. And the reason I bring this up is that Herbie has argued below and to this court that the ALJ's plane construction would preclude, effectively make it possible, the preferred embodiment in the specification in which you have the built-in optics. Does this manifestly not the case? Because having the, as the court has already noted... I don't understand what you're saying. Because... I don't understand what you're saying. Because I understand the accused device here has fixed optics, right? And what the ALJ is saying is that fixed optics are not a working channel, right? That you might have movable optics that could be in a working channel, but fixed optics, built-in optics, are not a working channel, right? You can't move something in and out of it. That's correct. But the other thing... You defend that. You think that's right. But... Well, that actually goes a little further than the ALJ. There's nothing in the specification or the claim that requires the optics to be fixed. There's not a requirement that they be fixed. You can have movable optics. You can have fixed optics. We're dealing with an accused device, which has fixed optics, right? The accused device is probed. The accused device, because this is a means-plus-function claim, you can't... The type of endoscope that may be used can vary. The issue is, you know, was there evidence that a probe, the accused probe, were used in an endoscopic device in a manner that infringed the claim? So what I'm saying is that the issue of... What's at issue here is not the construction of an overall endoscope. There may be endoscopes in which you have fixed optics. There may be endoscopes in which you have movable optics. But the question from a claim construction perspective with respect to working channel is just there must be more than one working channel. And if, as Irby... But Irby's argument is not disputing that there must be a plurality of working channels, but they're arguing that fixed optics, in which nothing can move, necessarily must be treated as a working channel. We've got that. We've got that. But my point is simply that the ALJ's construction would allow both for construction for fixed optics and for removable optics. And there's no... His reading does not read out... I'm simply responding to the point that our ALJ's claim construction precludes fixed optics, which is not true. I'm responding to their... This is an argument that Irby raised repeatedly, that there's somehow an inconsistency between the ALJ's claim construction of working channel and the existence of fixed optics in... I don't understand what you're saying. I really don't. I beg your pardon? I don't understand what you're saying. What I'm saying is, Irby has argued that unless you treat an endoscopic probe, which has a working channel and built-in optics, unless you treat both channels as working channels, that the preferred embodiment in specification is, in effect, precluded by the ALJ's claim construction. I think perhaps the problem is I've said in the obvious, which is that there's no inconsistency between, as you discussed at length before I came up here, between the illustration and specification, regardless of whether it contains the fixed optics or not, because of the existence, in addition to the optics, of plurality of working channels. I think, to the bottom of the line, from the Commission's perspective, I think it's that we agree that the issues that you raised earlier, the problems you identified with the claim construction offered by Irby are precisely the problems that the ALJ had below that the Commission shared. So, unless, I think at this point... I understood your primary argument to be, under any possible claim construction of any of the terms, Irby can't win because their proof was zero. You kept saying, no evidence, no evidence. Yes, so we do think there is no evidence. Therefore, we wouldn't need to reach the claim construction issue, in your view, if we agreed with you that there was no evidence that would be sufficient under any claim construction. Yes, Your Honor, that's why I began at that point earlier, which is that it's really not necessary, particularly on the 1.5mm probes, at a minimum, to reach these issues. And as far as the 2.3mm probes, as a legal question of whether Irby has met its burden of proof, and the burden of proof related to Irby, to show some form of infringement, and even under Irby's claim construction, the use of an endoscopic probe of a 1.5mm or 2.3mm in a manner perpendicular to the tissue to be coagulated is a non-infringing use. They don't dispute this claim construction. And the only testimony on the record at all as to how these 2.3mm probes were used is that they were used in a manner perpendicular to the tissue to be coagulated. So without reaching the claim construction for the term working channel, without reaching this... What testimony are you referring to, about perpendicular... There's the testimony of Dr. Althaus. I thought he just said he tried to make the angle 90 degrees. He said that he generally tried to make the angle Althaus was facing the tissue, which is precisely my point. But that use under Irby's claim construction would not be an infringing use. Because Irby agrees that a precise 90% is not infringing? He agrees that a perpendicular... What about 80% or 100 degrees? Well, the claim construction that Irby offered to trial court... Under Mr. Hampton's view, an angle of 80 or 100 would be infringing, right? It's only if it's exactly 90 that it's not infringing. Well, that is... Irby's claim construction alongside is a moving target. I'm not quite sure. He seems to be arguing, as far as I can understand, that any angle short of 90 degrees, 89.99... Figure 3 and Figure 6 already show something that is far from parallel. If you're going to rely on the parallel notion that the administrative law judge relied on, you have a problem, don't you? Those figures show it coming in at an angle. And maybe if that angle were off a little bit, you'd be at the chief judge's 80 degrees. Well, the Althaus construction of sidewardly was related to the longitudinal axis of the probe. And he said that basically the question was the relation between the longitudinal axis of the probe and the tissue. He's saying it's generally parallel, right? Correct. Which is a little odd, because that language doesn't appear in Claim 1. It appears in, I think, Claims 17 and 29. So the absence of that language from Claim 1 would maybe suggest that sidewardly doesn't mean generally parallel, wouldn't it? Well, the notion there... Well, two issues on that. First of all, this is a construction of generally parallel to... and that meaning not in the actual direction of... because Irby's proposed claim construction in his post-Herry briefs... I don't think you're suppressing my question. In addition, how can we interpret Claim 1 sidewardly and Claim 1 to be generally parallel when the language generally parallel appears specifically in Claims 17 and 29? Doesn't that suggest that sidewardly means something different than generally parallel? Well, generally one assumes under the doctrine of claim differentiation that different terms have different meanings. In this case, Irby's proposed claim construction was presumed... their own definition of their own patent terms was that they were the equivalent terms. This is not language the LJ came up with. Secondly, the generally parallel to language arose out of testimony to the effect that the lines... the gastrointestinal wall of tissue generally is not 100% even plane. You know, there are ridges. So that if you... But you're not addressing my question. Well, I think, Your Honor, that while one would presume under ordinary circumstances that there was a distinction and meaning between generally parallel... the generally parallel to elsewhere is another claim. In this case, the ALJ reasonably found that there really wasn't a different meaning and that his basis for finding that was a construction proposed by the plaintiff itself. We're just talking about whatever method gives the best coverage to the coagulant, right? In effect. I mean, I think what's important to remember and this isn't... these aren't claims... That certainly doesn't require parallelism, does it? No. I mean, the patent show an angle and that angle might, with the imprecision of a handheld device, increase to 80 degrees, as the Chief Judge said. The fundamental question is this relationship between the axis and the tissue. In other words, both of the figures, which Irby relies on, which is 15 and 20, and to which the ALJ pointed in discussing is generally parallel. First, his construction of side work that he's meaning alongside, by the way. That's a whole second set of questions. The ALJ never construed in the claim, in his claim construction per se, that side work is generally parallel to it. The issue arose in an infringement context when he found that because there wasn't testimony about that anyone had used these probes in a manner directed alongside or with the longitudinal axis directly at the tissue to be coagulated. Rather, I beg your pardon, that there was no testimony that these probes had been used in a manner that was alongside or with the longitudinal axis pointed in a manner parallel to the tissue, that there was no evidence of infringement. But this issue of whether or not generally parallel to the equivalent of side work is an issue that Irby has raised, really because they're disputing the ALJ's infringement analysis, and they're coloring it as a claim construction issue. But they didn't have a problem with the generally parallel notion until they didn't like the ALJ's infringement analysis that appeared. There were 11 probes missing at this North Carolina hospital. What happened to them if they were not used? Well, there was testimony from the nurse manager who was in charge of that lab that there are many reasons that these probes can't go missing. Testing, being enslaved, being used for fiduciary purposes, and that there were also other probes in the cabinet. There were also Irby probes there. Does that mean you do not know? We do not know. Well, why don't you just say that, and then Judge Reeder has a direct answer. Well, the issue is that the nurse manager said she did not want that item. You're allowed to rest your views on testimony. The other thing to bear in mind, I think that may be helpful in putting some context throughout these missing 11 probes, is that the nurse manager testified that over a calendar year they did about 12 of these procedures. So they tested this evidence that there were 10 or 11 missing in a 6-week period when 12 procedures in total were done in the course of a year. The proof is just that these probes, that something happens, may well have happened to these probes other than having been used in an APC procedure. Because there's no testing that had done a dozen in 5 weeks. If you were to decide against Irby on the working channel issue, that resolves the case, right? We don't need to reach this point. That's right. That is correct. All right, thank you. We'll hear from you. Thank you. Thank you. May it please the Court, Timothy DeWitt of the 24-hour IP Law Group on behalf of the Attorney General's. I will try to be extremely brief since it's already been covered by other counsel. First, with respect to the working channels, there's been some discussion of Fig. 1 showing the two working channels. And I would just point out that Fig. 12 also shows two working channels in addition to the built-in optics. The second thing I would like to point out is that with respect to the optical means that can be inserted into the channel and is movable, there was testimony from Irby's expert witness, Mr. Walbright, and that appears at JA 1255, line 24, through JA 1257, line 24. And in that testimony, he admitted that there was such a thing as an insertable optical fiber that could be inserted into that second working channel. And then the final point I'd like to make is just an answer to one of the first questions that came up, which was that the intervener's position would be that the ALJ correctly interpreted the term cyberly, because the parties agreed on the interpretation. And the issue is really one of whether it was properly applied to the accused device. Now, there's an obvious opinion that it was properly applied. Because if you look at the way the devices were used, and in particular, this comes up with the 1.5 millimeter probe, where Ms. Eisenbacher, who was the nurse manager, testified very clearly that there are all kinds of procedures in which they can point the probe directly at the tissue, so it is perpendicular. And as she said, there are lots of procedures that do that, and there was no evidence that she knew of that the accused probes were even used at all, let alone what type of procedure. There was no evidence of a specific instance of direct infringement. And I think that's really the key on that, on the cyber issue. But it's only dealing with the smaller probes, which I think you pointed out correctly. Are these the same products that are involved in the district court case? Yes, they are the same. Are these claim construction issues that we've been talking about today an issue in the district court case, too? Our position would be that the answer is no, because the summary judgment decision was based upon a different claim element, the flow rate claim element, which was not an issue in this appeal. I think there might have been some briefing on other claim elements, but our position would be that no, these same claim construction issues are not an issue in the district court case. Not dispositive or not litigated? Not litigated. I would say they are dispositive, but I would say that they were not decided by the district court. Because there was summary judgment. Well, it was summary judgment in the district court, and there were strict page limitations. So in the district court, we picked one claim element to really focus the arguments on, and the district judge agreed with us. In the ALJ... So what you're saying is that if somehow or other we were to reverse in that other case on the claim construction and the infringement determination made by the district court, that these other issues would then be in the case, they just haven't been decided by the district court? Yes, that is correct. There were claim construction. There was a claim construction. It was a marked decision. Covering some of the terms that are disputed in this case. Absolutely. But those of the terms that were the basis of the ALJ's decision, in this case, the basis of non-infringement, were not the basis the district court used in her summary judgment decision. Thank you. Thank you. Yeah, I would like to respond to a couple of things that were stated. First, it is Ernie's position that the claim construction of working channels was wrong because the ALJ read out of his claim construction various working channels that he even admitted were, quote, working channels in the patent. For example, he read out any working channel in which a device was not inserted to perform work, but yet he said that the patent itself said that a working channel could mean a channel through which gas was delivered or a channel through which suction was applied. So therefore, his definition, his construction of the working channel, is wrong as a matter of law because we had no time to Ernie disclaim the definition of working channel or certain things as working channel that are in the patent itself. Another issue that was raised was the 1.5 millimeter probes. I think Mr. Engler misspoke. It wasn't that these probes were gone over a course of six weeks. It was over the course of a year. And again, there was testimony that yes, they had early probes. They used up all their early probes before they started using the canopy probes. They did 12 APC procedures within a year. They had purchased 20 canopy probes. At the end of the year, they only had nine probes left. We think that's substantial evidence that these probes were used in APC procedures. Also, Mrs. Eisenmacher... Wait a second. How does that win the case for you? To say there's substantial evidence supporting that there was a trial in this case and the fact finder disagrees with your assessment of the evidence, found it deficient. Substantial doesn't seem to be a strong enough statement. You'd have to say that it was compelling that any reasonable fact finder would have to agree with it. And that actually is our position, that any reasonable fact finder would have to agree with it. But where's the evidence that the use reads on the claims? Even if it was used, even if those were used and not lost or in some kind of administrative purpose, how do we know they were used in accordance with the claims? Okay. Well, they're saying that they weren't even used. We say that once it's used and once the claim construction of side relief and working around it is changed to conform with the facts of this case, that you have to go back to, you have to remand it back to the ITC for a decision on whether or not with the proper claim construction there is use. If you don't have evidence of use at all, how can you... You don't get to prove something that you don't have in the record. You haven't proved its use was in accordance with the claims under any... Well, again, if the claim construction is rectified, then there is use in the record. We believe... What exact testimony would satisfy your burden under some altered construction? I can't find the testimony. You're going to have to pinpoint it for me. Well, actually, the ALJ basically... I'm asking a question about evidence, about testimony. I don't care about the ALJ or what we're saying or what your position is or anything else. I'm asking what line of what witness' testimony proved under your construction of the claim term that it was infringed? Whose testimony? What case? Well, not only was there testimony from Mrs. Eisenacher, but... Well, where in her testimony did she describe the use of these... of this equipment in a way that would read on the claim? The generator asked this question about three minutes ago and we still don't have an answer. Precisely what did she say that showed infringement? She explained how the devices were actually used. She said that the doctors would attempt to angulate the probes toward the bleeding tissue. And again, the one thing that's been missing in this whole discussion here today, Your Honor, is the fact that... How does that prove your case? We believe that if they... if there's angulation toward the tissue that is not parallel at the tissue... She doesn't know what actually happened. All she's saying is it's her understanding that the surgeon attempts to use angulation. That doesn't prove any particular angle in any particular procedure on any particular day. Your Honor, we believe that that testimony is such that if you agree that these probes were actually used and they also used early probes which are exactly identical, that by using them and angulating them at the tissue shows that there is side relief use of the probes. So therefore, again, if you agree that side relief means something other than parallel, and if you agree that the claim construction of a working channel is incorrect because the ALJ impermissibly required a working channel to be a channel which work is done through an inserted device, then you have to demand the ALJ. Could I understand this last exchange, because that concerns only the testimony about the 1.5 millimeter problem, correct? Yes, Your Honor. What is the testimony about the infringing, infringement using the 2.3 millimeter? Well, Your Honor, as the ALJ found that there was ampered testimony that people use these probes, they put a probe through a working channel and they agreed. They arrested this decision with respect to the 2.3 on different grounds, and that was that it didn't satisfy the working channel. It didn't satisfy the working channel. And if we were to agree with them on the working channel construction, we don't have to reach any of this other stuff. If you agree with them on the working channel, you don't have to go any further. But we believe you should not agree with them on the working channel, because they had to view, all these doctors' performance procedures had to view through optical means the procedure that was being done with the probe down a second working channel. And again, working channels should be defined broadly enough to be both an insertable and a fixed optics. And I think if Mr. Engler's correct that it can be either, then we think that the analysis of the ALJ was incorrect, because we have fixed optics in a working channel and it was evidenced that these procedures were used with such an endoscope, and you had, of course, the probe down that was delivering the argon plasma down the second working channel. So if they can view the procedure through fixed optics and fixed optics or insertable optics meets the optics through a second working channel, then we believe that there's ample evidence of infringement. But I still believe that you would have to remand back to the ALJ. Mr. Hampton, is it possible that this case is the case of the missing witness in the sense that if the point is to prove an angle between the electricity emitting portion of the apparatus compared with the tissue being coagulated, it seems like you needed to call one of the surgeons who did one of the procedures where a surgeon would say, yes, I did it at a 45 degree angle. Your Honor. That would be the proof you need, but I didn't see any such proof in the record here. Your Honor, we don't need the proof of any particular angle. The way this procedure works is that you have such a low flow rate that it comes tumbling out. So all you need to do is get close to the tissue that you coagulate. In fact, that's why under this procedure, you can actually coagulate tissue that's back behind the end of the probe. You just have to get near there. The electricity will go. We'll try to find the path of least resistance, which is bleeding tissue, which means anywhere near the end of the probe where tissue is bleeding, you will get coagulation. So therefore, as long as the probe is alongside in the general vicinity, is near the tissue you're trying to coagulate, and one of the things that we usually disclaim up front is you don't want the tissue to be right at 90 degrees because you have a lot greater chance of getting argon embolism that way. But as long as you're anywhere close to the tissue, as long as you're close to the tissue to be coagulated, the angle really doesn't make much of a difference because you're going to get coagulation. The whole thing about parallel is really a red herring. Nowhere in the patent do we discuss parallel. Nowhere in the IRB ever say that parallel. We say that it should include parallel orientations, but like we clearly show in the gray brief in Enhanced Figures 15 and 20 at pages 15 and 16, that there's, I think in Enhanced Figures 15, we point out and we colorize five places where the tissue is being coagulated. Of those five, only one of them is generally parallel. The same thing with Enhanced Figure 20. Four places where the tissue is being coagulated and only one of them is generally parallel. And all the parties agree that 15 and 20 show sideways. So 15 and 20 show sideways. And most of the angular orientation are something other than generally parallel. Generally parallel should not be how sideways it is. And again, Judge Brady, you're probably right. I don't know if it's claim construction or how they actually did his infringement analysis. And of course, in the accuracy, this is also a domestic industry analysis. But the long and the short of it is sideway cannot mean parallel because there's nothing in the patent that shows that sideway means parallel. All right. We've given both sides ample extra time so we're going to conclude the argument and take the appeal under a vote. Thank you.